3.14.0660 People of the State of Illinois at Lee by Gary Gnadek v. Devin Kochevar Appellant by Emily Koza Good morning, Your Honors. Mr. Gnadek. My name is Emily Koza, and I'm an Assistant Appellant Defender representing Devin Kochevar in this appeal. Mr. Kochevar was an 18-year-old high school senior when he was arrested and charged with criminal sexual abuse after his girlfriend's parents found out that they had engaged in a sexual relationship. Mr. Kochevar was charged under Section C of the Criminal Sexual Abuse Statute, which makes it a crime to engage in any sexual activity with any person between the ages of 13 and 17, regardless of whether the person under the age of 17 consented to the activity. So because Mr. Kochevar's girlfriend was under 17, their consensual sexual relationship was considered a crime. And this is important because this plays into the totality of the circumstances surrounding the statements that Mr. Kochevar gave in this case. Because a consensual sexual relationship isn't behavior that's inherently criminal. And again, this plays into the totality of the circumstances. So the issue raised in this appeal is whether the personal relationship between Mr. Kochevar and the officers who questioned him rendered the statements that he gave them involuntary. And like I said, whether a statement's involuntary, as you know, is determined by the totality of the circumstances. So this isn't your typical involuntary statements case. As the state rightly pointed out in their brief, the officers questioned Mr. Kochevar in a friendly manner. But again, that's kind of the crux of the argument in this case is that their friendliness and their personal relationship with Mr. Kochevar added to the coerciveness of the inherently coercive nature of the environment of being interrogated. Your Honors, the Fifth Amendment is rooted in the idea that a person under investigation should have the freedom or has the freedom to decide whether or not they want to assist the state in securing his conviction. And Mr. Kochevar was deprived of that freedom of choice here. From the beginning, the officers approached this as a friendly encounter and not a criminal investigation. According to Mr. Kochevar, they acted more like friends, not cops. And that's because he saw them as friends. They were friendly. They had a personal relationship. Prior to the actual interview? Yes, prior to the actual interview. One of the officers had coached Mr. Kochevar in youth sports and the other was a family friend, a friend of his father. So again, in other words, they were, he knew them outside of their role as police officers. And that created an environment where he viewed them, he did view them as trusted adults. And he saw them as friends. And they made him believe that they were on his side. They didn't really reveal that they were actually investigating for a crime. So again, he was in a position where he had these two men that he trusted. Anything that they told him, in any way that they downplayed the importance or the seriousness of this investigation, he was more apt to believe. Because again, he saw them as being on his side and not people with adverse interests to his own. So again, and this is important, because what they were investigating him for was behavior that's not really inherently criminal. For all intents and purposes, Mr. Kochevar and his girlfriend were peers. He was older than her, absolutely, but they were peers. They were both high school students. They had been in a romantic relationship. And they had sex, as teenagers often do. They weren't, these officers were asking him to admit to behavior that isn't inherently criminal. And it is criminal in this state. It is criminal, absolutely. It's criminal under the law. But again, it's a consensual sexual relationship. He didn't force her to have sex with him. He didn't drug her. This was behavior, they were, again, in a committed romantic relationship. Which is made criminal in this state. The relationship itself isn't criminal. It's the act of having sex, which is criminal. But again, it's not, what I'm trying to say is it's not evil in itself. It's not something like murder. It's not, Melvin would say, it's not evil in itself. It's a consensual sexual relationship. She freely admitted. She testified at trial. She never claimed that he forced her to have sex or that he coerced her. Isn't the effect of the statute to say that she can't consent? Correct. It is. So under. It's not a consensual act. I would argue that it's a traditionally consensual act and that she wanted to have sex. She chose to engage in that. I agree that it's not technically legally consensual, but it is consensual in the traditional sense. Is there any other term in the statute where he would not be liable? No. If he's 15 and she's 15 and they have consensual sex, they're brought together for 15 months. Correct. He's guilty. She's not. She technically is, too. But again, all of this was brought about by the girlfriend's parents. They were the ones who informed the police and began this investigation. So technically, yes, she, too, would be considered to have violated the statute if they were the same age. If his parents had done the same thing, she would also be sentenced to a couple years. Correct. No, I'm not sure about that. No, I'm not. Yeah. No. She's a person who's protected under the statute. So she can't be guilty. She's a protected party is my understanding. I would say so the way that the statute reads, it criminalizes all sexual activity between teenagers in Illinois, teenagers between the ages of 13 and 17. So I guess it would, though, depend on which side contacted the police in the first place. I'm not sure. What if she was the aggressor? Can you clarify? I mean, if she was in the relationship and she said, that's actually the only reason I don't know, and finally that relationship did end. Sure, under the statute, I think Justice McDade is correct in that she couldn't be prosecuted for that because she is the one under 17. She is the one protected by the statute. So because he is. No, I'm assuming by example that he's also guilty. I'm not sure. I just remember hearkening back. Maybe when it's Mr. Gennady that's starting to get all suspicious. I think under the statute, even if, in the hypothetical, the other person was pursuing the older person, the older person who's 18. Would be liable, yes, I agree. Would be liable under the statute. I agree in that circumstance. I can't think about that. They're both the same age. They're both under 17. Oh, they're both under. Yeah. Then it becomes. That's a different. Yes. I'm curious as to how that would be approached by an upset parent. Right. Male. Upset parent. If the male is under the age of 17, because the statute doesn't read it protects all females. It criminalizes sexual activity between all persons under the age of 13 and 17. So if it was the male's parents who were upset, then yes, I believe that they could be, that the female could be prosecuted for that as well. And, again, all of this discussion, I think, plays into the complicated nature of these types of questions and what was going on here. And that in Mr. Kotevar's eyes, and this isn't necessarily an issue of people who have murdered someone may not necessarily feel like they did something wrong, but in this case, again, this isn't an act which is inherently bad. He was a teenager, a high school teenager, who had sex with his girlfriend. And then he's talking to these men whom he knows outside of their roles as police officers who downplayed the importance and the seriousness of what was happening. And all of this created an environment in which his decision to give a statement wasn't a product of his rational intellect or his free will. One of the officers told him that he needed to give a statement. The officers were the ones that drove him there. One can't say no, that a yes isn't freely given. They created a situation where he was told he needed to give a statement about this thing, and the officers are downplaying the seriousness of this. But that has never been found to be a problem by the United States Supreme Court. Officers who appear to be friendly, officers who engage in mendacity, officers who mislead defendants in asking questions, none of that. In fact, it's all been approved, hasn't it? Absolutely, except, Your Honors, I don't know that the Supreme Court has ever addressed the situation when the officers doing the interrogating and doing the misleading have a personal relationship with the person that they're interrogating. Now, the Illinois Supreme Court has said that this is an additional factor to consider, and other courts in the state have recognized that this does add a subtle element of coercion to the process. And that's because in any way that they downplayed the investigation, he was that much more likely to believe because he knew them. I understand that, but even in this case, he's an adult based on his age, 18. He still might be in high school, but he's an adult for the purpose of Illinois. And even if we were dealing with a juvenile, the Illinois Supreme Court and the United States Supreme Court, they've accepted confessions under a lot more, from your standpoint, egregious situations than we've got here. And acting fairly, doing all kinds of things, not having their parents in the room, all kinds of situations. They've never had a case that I'm aware of that says based on a prior relationship, a friendly relationship or an acquaintanceship with a police officer would disqualify that police officer from being in the room trying to get a confession. They have suggested as much, though, in the Whitler case that I cited in my brief, that in that case, the chief of police was a friend of the defendant being interrogated and spoke with him briefly but didn't really participate in the interrogation. And so the Illinois Supreme Court did find that the confession in that case was voluntary, but signaled that where an officer that has a personal relationship with the person that they're interrogating, that that is coercive. They didn't find it coercive in that case because the officer wasn't participating in the investigation. But here, these men were the sole interrogators. And again, any lie that they told him, which they were legally allowed to do, added to the coercive nature of the environment because he was more apt to believe them because he believed that they were on his side. Juveniles are allowed to have a trusted adult with them in the interrogation room. And he didn't ask for a trusted adult because he believed that they were already in there. He believed that the officers had his best interests at heart because they had this personal relationship. Did they ever tell him that they were investigating him for a crime? No, they asked him to, I believe, I don't think, it differs a little bit. So I believe the officer said that they didn't tell him why they wanted to speak with him. And Mr. Cotras said that they were coming to get some sort of statement about his relationship. And again, well, yes, that might signal to him that he might be in trouble. Again, in this case, all of this was sparked by the fact that the girlfriend's parents had found out that they had engaged in this relationship. And he might have believed, yes, that his girlfriend's parents were out to get him. But any of those fears would have been allayed by the fact that he was being questioned by men whom he trusted and who downplayed the seriousness of what was going on. And so, again, all of these factors created a circumstance where Mr. Cotras didn't freely and rationally decide to expose himself to criminal liability. And accordingly, he asked that you reverse the trial court's ruling and denial of the suppression motion, reverse his conviction, and remand the spender for further proceedings with the statement being suppressed. Was he put on the sex offender list? Yes, he was. He has to register as a sex offender for 10 years. Not life? Not life, but he has to register minimum for 10 years. But as your honors know, sometimes it's, I mean, the burdens that are placed on people who have to register are immense and that it does expose him to further criminal liability down the road if something were to happen and he was not able to register or something went wrong with that. And he could then be prosecuted again. And then his registration period is extended for another 10 years. Thank you, Mr. Cotras. Thank you. Did you want to answer anything? No. Mr. Kennedy? May it please the court, counsel? With respect to your honors' question, when I first started with the Appellate Prosecutor's Office, we still had basically common law rape, which was carnal knowledge, female, against her will by force. And with the advent and the change of that terminology, it was directed more toward female. The legislature came up with the crimes, criminal sexual assault, criminal sexual abuse, which is more gender neutral. So I believe in the case we have here, no, this individual, or excuse me, the victim in this case, the 15-year-old, would also not be criminally responsible because of the age limitations. The age limitations are 13 to 17, 13 to 15, whatever they are, okay? But in your example, if both, the male and female, were both 15, then both would be potentially criminally responsible for their conduct, one against the other, because... Both would be prosecuted at once. Both would be prosecuted at once, because the offense is... And the statute works, because you have to have to get them out of school, and you have to have the 10 years of sexual abuse status. I mean, it's kind of scary. It is, and I've had cases in which I've dealt with the reporting, and I've dealt with the fact of minors having to take and report as sex offenders, how the statute is interpreted, et cetera. It is a very... It is... It sounds trite to say this. It is what it is. The legislature, in their wisdom, has done this. The thing about that is, does that, does your concern and honor, play into the fact of this case, which is the voluntariness of the confession? And in this case, although counsel has made a very large point of it, I don't think it does. In reality, in this case, this case really comes down to, very simple, it comes down to whether or not, in your honor's mind, the fact that this defendant happened to take a room in a small town, a prophet's town, in which, more than likely, just about everybody knows everybody, unlike living in Chicago, or Joliet, or Rock Island, or Peoria, whether or not this is a close, personal relationship, such that the mere fact of them going in to speak with this individual, somehow creates a coercive atmosphere. He was a coach, right? A baseball coach. Not a mentor. Not somebody who was there, who advised the defendant in matters of life, you know, stay off of drugs, you know. But he did say they were friends. They were friends. So does that mean that a police officer who was friends with someone, can't arrest them, can't stop them, can't speak to them, can't talk to them? Do you think they need to tell them that they're investigating them for a crime, though? In that circumstance, where they're friends. And you bring him in, and you talk to him, and you don't ever tell him that you're investigating him for criminal activity. The defendant, in this case, said he knew what was going on. He knew what they were talking about, as well as the fact that, from a practical point of view, friends or not, if you are asked by police to come to the station to take and answer some questions, what does that raise in your mind? That they just want to take and have a friendly conversation? That it's just, that they're not doing something in their line of police work? Well, that's sort of contrary to a lot of arguments made by the prosecutor that the person being questioned was free to leave, free to go. I mean, you've made those arguments, haven't you? Oh, sure. And so when you say, what does it mean in a person's mind when they come to the police station, we've got a lot of appellate law that says, well, this person felt he was just having a chit-chat. He felt free to leave and wasn't being investigated in particular for the crime. Well, it's not so much that in those situations where you're saying they're not being investigated for a crime, in a lot of those situations what will happen is police might think that a person happens to be not so much necessarily a person of interest, but someone who just happens to have knowledge about a crime, happens to know something. And so they ask the felon. What they do is, and I know you can take a stance to play on words, but the thing is there's a difference between interviewing someone and interrogating someone. Well, I don't want to be the dead horse, but... I'm not saying that they were here to interview him. But both as a trial judge and a felony judge hearing these motions, that in the typical sex case, okay, especially when you're dealing with sex with children, the police routinely have the person come to the station, say, we just want to ask a few questions and just find out what happened. We're just trying to find out what happened. They ask the person, they let the person go, and then arrest them later. That person was the target of their investigation, but they got a confession from him, they got statements from him. That's routine practice. I mean, there's tons of cases like that. I mean, they must teach that at police school. That's been going on for a long time? Okay, number one... And then nothing's wrong with it legally? No, nothing's wrong with it legally, but there are situations where, and a lot of times, a lot of times there are situations where facts are presented and police really do just want to find out what's going on. They don't necessarily have this person as a target, and they want to find out what is going on. And in some of these situations, the person from whom they wish to take and find things out ends up happening to be someone involved in the crime. Is that happenstance? I think a lot of times it is. Is that necessarily a police technique? Maybe in certain cases it is, too. But having said all that, that's not this case. Well, here, he said he, after the interview, he said that he knew why he was there. But did he know? I think it's an interesting point that Ms. Grossman made about the malignant nature of this, or the non-malignant nature of this, that perhaps they were talking to him about having sexual intercourse with her. He never felt that that was a crime, because everybody in the school, a number of people in the school did. But, you know, I wonder if that ties it together, in his mind, really. I mean, you know, it's his girlfriend. So, you know. What it seems as though is happening is the fact that the voluntariness of the confession is being judged by whether or not we, as individuals, agree or disagree with the statute. That we, as individuals, agree or disagree with the fact of the reality of what's going on in the high schools. That there are many, many... Well, that's just my opinion. I don't speak for the college. But I'd like to broaden that out, because whether or not... I guess what I'm just saying is whether or not what we might personally think about the purpose behind the statute, and whether or not that statute is even in existence, and whether or not high school students who engage in this kind of activity should or shouldn't be prosecuted. But I think there's a difference. It is. It is. But does that... But I am troubled by the statute. And I... I understand John. Right. But that I don't think can take in play into whether or not, with respect to this individual, whether or not what he did when he was at the station was voluntary or involuntary. I think when you look at... And I can go down. I've got it all listed here. Age, intelligence, experience, history of the condition, the duration of the detention, the duration of the interrogation, the presence of Miranda warnings, the presence or absence of physical or mental abuse, the legality of detention. Excuse me. There's no allegation of that kind of coercion here. No. The allegation is that it was friendly coercion. We have... So we have friendly coercion, and then we have the old typical third-degree coercion, the old James Cagney kind, where they turn the light on the guy and they take the rubber hoses and they beat the confession out of him. Let me ask you this. Do you believe that it's ever possible for there to be coercion that doesn't involve the kind of physical things that you were outlining there? These things that I outlined here... These things that I outlined here are the factors that the United States and Illinois Supreme Court have set out on how we take and judge. Now, with respect to Your Honor's question, there are and there can be... Counsel has pointed out a couple cases. One, if it's someone who has this close personal relationship, let's say a pastor, let's say a counselor, it could be... And counsel points out that the defendant here should have had a close family member come by. Well, the close family member could very well have questioned him and said, you know, tell the truth, do this, do that, okay? The point is, it's the relationship. Simply because there is a friendship, simply because... And a friendship, simply because they knew each other. Is that the kind of close personal relationship that you would be able to take and say equals a coercive environment? That's the issue for this court. I don't think so. Let me ask you the question in a different way, or pose the question in a different way. If you have police officers who have a personal relationship with a defendant and they bring the defendant in and they never separate themselves and what they're doing from that previous close personal relationship by saying to him, we have you here investigating you for a time. Does that personal relationship supersede in a sense? Maybe supersede is not the word I want. But anyway, does that relationship then predominate in what's going on in that room? How can you separate what you have said, how you've described it? How can you take and separate that out factually and emotionally and intellectually? In the sense of you're overriding factual aspects here is this close personal relationship, which number one, you're going to have to determine existed in this case. Close personal. Not just the fact that they knew each other. But if you take and do that, that is indeed going to be as much of a factor that exists throughout the interrogation just like, if you will, the I'm a police officer, I don't know you, and I'm going to put the spotlight on you and I'm going to grill you and grill you and grill you and beat you into rubber holes kind of relationship. It's the point at the opposite end of the spectrum is all I'm trying to say. It's inherent in there. Now, and that's the reason why I think the law and the courts have said that's the reason why. It's not just the fact that we know each other. It's the fact of what is the nature of that knowing each other. Is it someone that this individual relied upon for advice, for mentoring, for helping them get through life? And if that's not the case, just because the fact that they know each other is not the kind of relationship that creates the kind of coercive environment that would prevent this individual from making his own decision as to whether or not I am going to take and say yes, I have sex with this individual or deny it completely or just take and say I don't want to talk to you at all. What's the bright line in your opinion? I don't have a bright line. What's the fuzzy line in your opinion? Put it this way. Certainly not a baseball coach. Well, you've heard people attribute to the baseball coach their whole future life. Because of my coach. Do we have any evidence that he... Because of my coach. I went to college. I went to law school. I became a doctor because of my coach. But do we have... My baseball coach. Not simply with one season, but what you usually have is this person was in my life, this person did this, this person did that, and this person... I sought this person out for advice. I sought this person out that they can help me do things. We don't have it. We just simply have the fact that he coached me in baseball one summer. I coached a lot of kids in baseball when my kids were there. And I can tell you, I have no close personal relationship with anybody. But yet, I know that. I have a friendship. But a close personal? No. How much evidence would you take in the motion to suppress? If this relationship's a question, a pertinent question, then I suppose in these motions and press hearings, when you have the friendly, fuzzy interview, not the lead pipe interview, then you're going to put the officer on the stand and go into... I guess it would be very relevant, how often did you talk about your future? How often did you talk about being a good citizen? I suppose you'd ask those questions. This officer was asked, did you mentor him? He said no. He just coached him. Just like you would coach other... So in this fuzzy line, that would make a big difference, those kinds of questions, right? I think those kinds of questions are very pertinent, are very important. Mr. Ganinovic, if we take Ms. Koza's premise that this is not conduct that, absent some knowledge of the statute, a high school kid would think was criminal behavior, if we accept that premise. And then we have a situation where somebody that you have known for your entire life and another person who has been closely involved with activities that you have done, and whether he considered himself a mentor or not, coaches frequently are because they teach life skills and character development. And then you bring him into the station and you don't tell him, I'm investigating you for a crime. It seems to me that at that point, the simple answer here would have been for them to say, you have been charged with criminal activity and we're here to find out whether or not you're responsible for it or you're guilty of it. They didn't do that. So the question is, from his perspective, what did he think was going on there? Did he think that these were friends who were just talking to him nicely about what he had done and saying, hey, this is not a good idea, you need to stop the parents, and you need to stop this. They didn't let him know that they were investigating him for a crime. So in a circumstance like that, is that coercive? Friendly coercive? No. Because in determining whether or not an individual has voluntarily chosen to speak to police, police do not have to take and tell them that they are necessarily investigating him for a crime. Number two, in this particular case, the defendant had really not been arrested at this point, they were just bringing him down because they had an allegation that he had had sexual contact with a 15-year-old. And I believe that under the circumstances, we were trying to take and determine whether or not he willingly decided to speak with police. He didn't willingly decide. Right, he didn't willingly decide. And one of the divining factors in that is not just simply the fact of how the police knew about him. I would say there'd be more of a problem if there had not been Miranda warnings given. He was basically told he didn't have to speak. He was told that anything he said could and would be used against him if he said something incriminating. This all indicates, and this individual was of average intelligence, had no learning disabilities, was not emotional, was very much all together. Basically said he knew what was going on, he knew why he was there. And we take a look at all of that, and then we try to take and factor in this friendship, this fact that we happen to know each other because we happen to live in a very small town. As well as the fact that because one of the officers coached baseball. That all factors, that all enters into, but when we look at his decision, was his decision intelligently made? Did he decide he didn't do that? It seems as though a lot of what's being argued here is the fact that we're arguing the fact that we maybe as adults in our position think that he made the wrong decision. But did he do it intelligently? Did he do it knowing? Did he know what was going on? Did he know what was going to be happening to him? And yes he did. Did he know what the crime was? He may not have specifically known what the crime was, but he knew why he was there. And what he was there was to basically speak about his sexual relationship with the 15 year old. Now the fact that he may not have known that she is protected by the statute based on her age, regardless of consent, that is not something that I don't think the police have to take intelligently. I don't think they have to take and say, hey by the way, you know, there's this thing called statutory rape. I don't think they have to take and tell him that in order for him, before they start questioning, for him to make up his mind. The question is, at the time he decided to speak to police, did he do that voluntarily and intelligently? And that he did. And what was the police conduct in this case? The police conduct in this case was something that more times than not, at least I as a prosecutor, would much prefer to see. Because this is not the kind of questioning here. That lends itself to overbearing. That lends itself to an involuntary type of a confession. And I think in this particular case, I think that what we have is, I think we have a voluntary confession. We don't have the kind of relationship that's trying to be portrayed here that the law sets out as being indicative of a coercive environment. And so therefore, the people would ask that this court affirm the denial of the motion of this case. If there are any questions, I'll be happy to attempt to answer them. You think we've asked enough already? Thank you, Your Honor. Thank you. Thank you. Your Honor, one of the points that Mr. Ganodovic brought up is his concerns about whether, you know, Your Honor's opinions of the criminal sexual abuse statute or this specific section should play into the analysis of whether the statements in this case were voluntary. And my response to that is they absolutely should play into whether or not this was voluntary because it's part of the circumstances. The test for determining whether or not a confession is voluntary is the totality of the circumstances. This is part of that totality. It can't be removed from the analysis. And Justice McFadden, you made the point that, you know, the officers could have told him from the beginning because they had this personal relationship that, listen, this is serious. We got a call from the girl's parents. You might be in some trouble here. They chose not to do that. They chose to use the funding tactics of downplaying the nature of the situation, which is common. It happens. That's generally how police nowadays tend to approach these things. It's not uncommon. It's been approved by the courts, constantly being approved by the courts. Absolutely. But in this case, it was coercive because of the fact that they had this personal relationship. What about the Miranda warnings? The Miranda warnings, I would argue, the protections are eroded where the police, the police with whom this young man has a personal relationship, don't make it clear that they're investigating a crime and they downplay the nature of the investigation. And I think your Honors know that a lot of times when officers do give Miranda, they downplay what Miranda means. Oh, this is just routine. Don't worry about it. All that we're dealing with is this particular case. But, again, the officers from the beginning downplayed the seriousness of what was happening when they approached him. And, again, that plays into the totality of the circumstances. Mr. Gnodovic argues, you know, that, well, their relationship wasn't that close. The officer said, well, I never mentored him. With all due respect, how the officer felt about Mr. Kochevar isn't the relevant point of view. What's relevant in determining whether or not Mr. Kochevar was conversed is how Mr. Kochevar viewed these officers. And the state has agreed that he viewed them as being in a position of trust. And the officer testified that they were friends. Again, all of this needs to be taken, all of this plays into what happened here. And, as such, we ask that your honors, again, reverse the trial court's denial of the motion to suppress, reverse the conviction with the statement suppressed. Thank you. Thank you, Mr. President. Thank you both for your arguments today. We will take this matter under advisement and get back to you with a written decision.